UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TYRONE JOHNSON,<br><br>              Plaintiff,<br><br>    v.<br><br>CITY OF OLYMPIA, et al.,<br><br>              Defendants. | CASE NO. C17-5403-MJP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment. (Dkt. No. 47.) Having reviewed the Motion, the Response (Dkt. No. 61), the Reply (Dkt. No. 67) and all related papers, the Court GRANTS IN PART and DENIES IN PART the Motion. The Court declines to hear oral argument on the matter.

**Background**

The majority of material facts in this case are disputed and are set forth as follows: On the night of May 28, 2014, Plaintiff Tyrone Johnson, an employee of CenturyLink, was on-call when he was dispatched to repair a downed system. (Dkt. No. 61 at 2.) Upon completing the

offsite repair, Mr. Johnson returned to the CenturyLink facility, driving a CenturyLink van. (Id.) Mr. Johnson claims that a police officer—who he later identified as City of Olympia Police Officer Ryan Donald—followed him as he was returning to the CenturyLink facility. (Dkt. No. 61 at 4, 5.) Mr. Johnson claims that he acknowledged Officer Donald, and Officer Donald acknowledged him. (Id.) Mr. Johnson claims that Officer Donald then parked his police car across the street and watched Mr. Johnson enter the CenturyLink building. (Id.)

Officer Donald denies following Mr. Johnson, and claims that he was parked across the street from the CenturyLink facility when he observed that the building's door was open. (Dkt. No. 47 at 1-2.) Officer Donald claims that he never saw Mr. Johnson nor any other employee enter the CenturyLink building prior to that, and was concerned that a burglary might be underway. (Id.) At 2:21 AM, Officer Donald called dispatch to report an unsecured premise. (Id.) Over the next ten minutes, Officers George Clark, Jonathan Hazen, Eric Henrichsen, and Sergeant Matthew Renschler arrived on scene. (Id. at 2.)

The responding officers gathered at the entrance to the building. (Id.; Dkt. No. 61 at 3.) The officers claim they announced themselves as police and ordered anyone inside to make their presence known. (Dkt. No. 47 at 2; Dkt. No. 61 at 9.) Mr. Johnson disputes whether the officers announced themselves as police and claims that, as he approached the entrance where they were stationed, he observed six police officers with flashlights and guns drawn and pointed at him. (Id. at 3-4, 9-10.) The officers claim their guns were pointed at the ground, in the "low-ready" position at all times. (Dkt. No. 47 at 2; Dkt. No. 61 at 11.) Each officer denies pointing a gun at Mr. Johnson at any time. (Dkt. No. 47 at 3.)

The officers instructed Mr. Johnson to turn around, walk backwards toward their voices, and kneel on the ground. (Dkt. No. 61 at 3; Dkt. No. 47 at 2.) When he complied, the officers

claim they approached him, handcuffed him, and thereafter helped him to his feet and escorted him from the building. (Id.) Mr. Johnson claims that once he was handcuffed and kneeling, he was thrown face down onto the ground. (Dkt. No. 61 at 4; 14-15) Mr. Johnson claims that four guns—including two handguns and two AR-15 assault rifles—continued to be pointed at him after he was handcuffed. (Id. at 10.) Mr. Johnson claims he remained in handcuffs for 10-15 minutes, and was detained for approximately 45 minutes. (Dkt. No. 47 at 3.) The officers claim that Mr. Johnson was handcuffed at approximately 2:33 AM and remained in handcuffs for no more than four minutes. (Id. at 2.) Sergeant Renschler claims he removed the handcuffs as soon as he saw that Mr. Johnson was wearing a CenturyLink uniform. (Id.; Dkt. No. 61 at 17.)

Once Mr. Johnson provided proof of his identity and established that he had permission to be at the facility, the officers cleared the scene at approximately 2:45 AM. (Dkt. No. 61 at 13-14; Dkt. No 47 at 2.) Mr. Johnson claims he saw the officers laughing and exchanging high-fives, and claims that one of the officers followed him as he left the facility in his personal car. (Dkt. No. 61 at 17-18.)

Mr. Johnson filed suit, alleging causes of action including: (1) intentional infliction of emotional distress (outrage); (2) misconduct of public officers; (3) excessive force in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution; (4) failure to train, supervise, or instruct; (5) municipal civil rights liability; (6) negligence; (7) violation of the Fourth Amendment and 42 U.S.C. §§ 1981 and 1985(3); and (8) failure to protect. (Dkt. No. 1; Dkt. No. 31.)

Defendants now move for partial summary judgment.[1]

---

[1] Mr. Johnson opposes summary judgment as to the outrage, 42 U.S.C. §§ 1981 and 1985(3), and Fourth Amendment claims, but did not substantively respond as to the remaining claims. (See Dkt. No. 61.) While a non-movant's failure to respond to arguments raised in a

**Discussion**

I. **Legal Standard**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden to demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute over a material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

II. **Intentional Infliction of Emotional Distress (Outrage)**

A claim for outrage requires a showing of (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) that the plaintiff suffered severe emotional distress. Dicomes v. State, 113 Wn.2d 612, 630 (1989). The conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Grimsby v. Samson, 85 Wn.2d 52, 59 (1975).

Whether conduct is sufficiently outrageous is ordinarily a question for the jury. Dicomes, 113 Wn.2d at 630 (citing Phillips v. Hardwick, 29 Wn. App. 382, 387 (1981)). However, it is

---

summary judgment motion does not constitute "a complete abandonment of its opposition to summary judgment," failure to respond to a fact asserted in the motion permits the Court to "consider the fact undisputed for purposes of the motion." Heinemann v. Satterberg, 731 F.3d 914, 917 (9th Cir. 2013) (quoting Fed. R. Civ. P. 56(e)(2)).

the Court's responsibility to determine "whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." Id. The standard for whether conduct is considered "outrageous" is a high one: "[I]t is not enough that a 'defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Grimsby, 85 Wn.2d at 59 (quoting Restatement (Second) of Torts § 46 (1965)).

Even accepting Mr. Johnson's version of the events—that Officer Donald followed him in his CenturyLink van, observed him entering the CenturyLink building, observed that he was wearing a CenturyLink uniform, yet still reported the unsecured premises to dispatch; that after arriving on scene, the officers did not announce themselves as police; that the officers handcuffed Mr. Johnson, pointed their guns at him, and pushed him to the ground; and that the officers laughed and high-fived each other before leaving the scene—the Court finds that Mr. Johnson has failed to demonstrate that the officers' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id.

The Court GRANTS Defendants' Motion with respect to this claim.

### III. 42 U.S.C. §§ 1981 and 1985(3)

Claims under 42 U.S.C. § 1981 ("Section 1981") and § 1985(3) ("Section 1985(3)") require a showing of racial animus. See General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982) (Section 1981 claim requires showing of "intentional discrimination" on account of race); Griffin v. Breckenridge, 403 U.S. 88, 102 (1971) (Section 1985(3) claim requires showing of "invidiously discriminatory animus behind the conspirators' actions.").

Evidence of racial animus may be either direct (e.g., derogatory or offensive comments) or circumstantial, but if circumstantial must be "specific and substantial." Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1152 (9th Cir. 2006). A plaintiff's subjective belief that conduct is motivated by discriminatory intent is not sufficient to defeat summary judgment. Foster v. Berkeley Police Dept., 2011 WL 5861266, at *8 (N.D. Cal. Nov. 22, 2011) (citations omitted); see also Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005) ("[C]onclusory statements of bias do not carry the nonmoving party's burden in opposition to a motion for summary judgment," and "the fact that [plaintiff] is Native American and [defendants] are not, standing alone, does not mean that defendants have discriminated on the basis of race.").

Even accepting Mr. Johnson's version of the events, the pleadings and evidence in the record—including the exhibits and deposition transcripts—do not establish racial animus on the part of any officer.[2] Mr. Johnson does not even attempt to make out a claim with respect to Officers Clark, Hazen, Henrichsen, Wilson, or Sergeant Fenschler. While Mr. Johnson claims that Officer Donald's racial animus is evidenced by the fact that he followed Mr. Johnson in his CenturyLink van and by various posts on Officer Donald's Facebook (Dkt. No. 61 at 22-23), this evidence does not come close to being "specific and substantial." First, that Officer Donald followed Mr. Johnson—without more, is not evidence of racial animus. Second, Officer Donald's Facebook post showing an image of Martin Luther King, Jr. with the caption "I have a Dreamcicle" does not appear to have been directed to Mr. Johnson in any way. (See Dkt. No. 64, Ex. P.) The post appears to be a weak attempt at humor and is perhaps insensitive, but does

---

[2] The Court is mindful of the fact that "the burden of aggressive and intrusive police action falls disproportionately on African American, and sometimes Latino, males." Washington, 98 F.3d at 1187. However, the fact that Mr. Johnson is African American and the Defendants are Caucasian does not, standing alone, constitute evidence of racial animus.

not support a finding of racial animus. The other posts on Officer Donald's Facebook with which Mr. Johnson takes issue—a photograph of him allegedly wearing a "Hitler mustache" and a meme "of someone shooting an angel" similarly do not support a finding of racial animus.

The Court GRANTS Defendants' Motion with respect to these claims.

### IV. Fourth Amendment

Defendants contend that Officers Clark, Hazen, Henrichsen, and Wilson, and Sergeant Renschler are entitled to qualified immunity with respect to Mr. Johnson's Fourth Amendment claim. Under the Fourth Amendment, the amount of force used must be "objectively reasonable under the circumstances." Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). In making this determination, the Court must evaluate (1) the type and amount of force used; and (2) the need for force as based upon the severity of the crime, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or attempting to flee; and (3) must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." Id. at 1056-57; see also Graham, 490 U.S. at 396; Lal v. California, 746 F.3d 1112, 1117 (9th Cir. 2014).

#### A. Qualified Immunity

In determining whether the officers are entitled to qualified immunity, the Court considers (1) whether the relevant statutory or constitutional right was clearly established and (2) whether the officers could have reasonably believed their conduct was lawful. Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995). "If the law did not put the [officers] on notice that [their] conduct would be clearly unlawful, summary judgment based upon qualified immunity is appropriate." Saucier v. Katz, 533 U.S. 194, 202 (2001); see also

Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (an officer's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable [officer] would have understood that what he is doing violates that right.") (internal quotation marks and citation omitted).

### (1) The Force Used in Effecting the Terry Stop Violated the Fourth Amendment[3]

Viewing the facts in the light most favorable to Mr. Johnson, the Court concludes that the officers' conduct violated the Fourth Amendment.

"Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." Washington v. Lambert, 98 F.3d 1181, 1187 (9th Cir. 1996) (citations omitted). In making this determination, the Court considers the "totality of the circumstances," including (1) "the intrusiveness of the stop (i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted" and (2) "the justification for the use of such tactics (i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken"). Id. (citations omitted).

---

[3] "There is no bright-line rule to determine when an investigatory stop becomes an arrest," and the ultimate outcome is necessarily "fact-specific." Washington, 98 F.3d at 1185. For purposes of this motion, the Court assumes, without deciding, that the officers effected a valid investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968). Mr. Johnson disputes this contention, but his response appears to confuse a Terry stop with a traffic stop. (See Dkt. No. 61 at 21-22.) A Terry stop is a brief detention and interrogation based upon a "reasonable, articulable suspicion" that a person has committed or is about to commit a crime based on the totality of the circumstances. Gallegos v. City of Los Angeles, 308 F.3d 987, 990 (9th Cir. 2002); see also United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion is a "less demanding" standard than the probable cause required for an arrest, and requires only "a minimal level of objective justification." Gallegos, 308 F.3d at 991 (citations omitted).

1    The Ninth Circuit has explained that "handcuffing substantially aggravates the
2 intrusiveness of an otherwise routine investigatory detention and is not part of a typical Terry
3 stop." United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982), cert. denied 459 U.S. 1211
4 (1983); see also United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir. 1990). Similarly, "if the
5 police draw their guns it greatly increases the seriousness of the stop." Washington, 98 F.3d at
6 1188 (citations omitted). This is because a pointed gun "makes the encounter far more
7 frightening than if the officer's gun remains holstered, or even drawn but pointed down at his
8 side." Id. (quoting United States v. Serna-Barreto, 842 F.2d 965, 967 (7th Cir. 1988)).

9    Such intrusive means of effecting an investigatory stop are typically allowed only in
10 specific circumstances, including (1) where a suspect is uncooperative or takes action at the
11 scene that raises a reasonable possibility of danger or flight; (2) where the police have
12 information that the suspect is currently armed; (3) where the stop closely follows a violent
13 crime; or (4) where the police have information that a crime that may involve violence is about
14 to occur. Id.; see also United States v. Miles, 247 F.3d 1009, 1012-13 (9th Cir. 2001). Other
15 relevant factors include "the specificity of the information that leads the officers to suspect that
16 the individuals they intend to question are the actual suspects being sought" and "the number of
17 police officers present" (i.e., whether an officer is "alone and outnumbered" or whether
18 "numerous policemen approached and surrounded a single suspect with guns drawn").
19 Washington, 98 F.3d at 1189-90 (citations omitted).

20    Here, none of the factors that might otherwise justify the invasive techniques used by
21 Officers Clark, Hazen, and Henrichsen, and Sergeant Renschler (i.e., pointing guns, handcuffing,
22 and shoving Mr. Johnson to the ground) existed. While the officers contend that it was late at
23 night, they were responding to a report of an unsecured premise, they believed a burglary might

1 be under way, they did not know whether there was anyone inside the building, and the building was "large, dimly lit, and contained many places for individuals to hide" (Dkt. No. 47 at 16), these factors are presumably present any time police are dispatched to an unsecured commercial building after hours. There was no information—let alone *specific* information—that a violent crime had occurred or was about to occur, that Mr. Johnson had committed or was about to commit a crime, or that Mr. Johnson was armed or dangerous, particularly once he was kneeling on the ground and in handcuffs. See Del Vizo, 918 F.2d at 825. Further, it is undisputed that Mr. Johnson was cooperative and did exactly what the officers ordered him to do. Finally, there were at least five officers on scene, and only one Mr. Johnson.

**(2) The Law was Clearly Established**

Viewing the facts in the light most favorable to Mr. Johnson, the Court concludes that it would have been clear to the officers that handcuffing and pointing a gun at Mr. Johnson violated the Fourth Amendment.

The officers cite no case in which "reasonable measures" in a Terry stop include ordering a suspect to his knees, pointing a gun at him, *and* handcuffing him. To the contrary, the law is clear that if the subject of a Terry stop is cooperative and "the officers do not have specific information that they are armed or specific information linking them to a recent or inchoate dangerous crime, the use of such aggressive and highly intrusive tactics is not warranted" absent "extraordinary circumstances." Washington, 98 F.2d at 1192. In particular, the Ninth Circuit has consistently made clear that pointing a gun at a cooperative, unarmed suspect is rarely warranted. See, e.g., Robinson v. Solano County, 278 F.3d 1007, 1015 (9th Cir. 2002) (pointing a gun at a suspect constituted unreasonable force where no exigent circumstances existed and the suspect was apparently unarmed, even where he admitted to having earlier used a gun to shoot

his neighbor's dog and officers had not yet conducted a pat down); Hopkins v. Bonvicino, 573 F.3d 752, 776 (9th Cir. 2009) (pointing a gun at a cooperative, unarmed suspect and failing to holster the weapon until after the suspect was handcuffed constituted unreasonable force where officers outnumbered the suspect).

The Court finds that material facts in dispute preclude the application of qualified immunity to the officers' conduct. Therefore, the Court DENIES Defendants' Motion with respect to the Fourth Amendment claim as to Officers Clark, Hazen, and Henrichsen, and Sergeant Renschler. The Court GRANTS Defendants' Motion with respect to Officer Wilson, as there is no evidence that he was present for the Terry stop, or that he otherwise detained or used force on Mr. Johnson.

## V. Plaintiff's Remaining Claims

Mr. Johnson's response does not address his remaining claims for misconduct of public officers; excessive force; failure to train, supervise, or instruct; municipal civil rights; negligence; or failure to protect, which are discussed briefly as follows:

### A. Misconduct of Public Officers

Misconduct of public officers is not a standalone cause of action in Washington, but is instead regarded as a "level of intent which negates certain defenses which might be available in an ordinary negligence action." Rodriguez v. City of Moses Lake, 158 Wn. App. 724, 730-31 (2010). The Court GRANTS Defendants' Motion as to this claim.

### B. Excessive Force Under the Eighth and Fourteenth Amendments

Mr. Johnson claims excessive force was used against him in the course of an arrest or investigatory stop, a claim that is "most properly characterized as invoking the protections of the Fourth Amendment." Graham, 490 U.S. at 394. Mr. Johnson does not claim that excessive force

was used against him either while he was a pretrial detainee (Fourteenth Amendment) or after he was convicted or sentenced (Eighth Amendment). See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015); Graham, 490 U.S. at 393 n.6; Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977). The Court GRANTS Defendants' Motion as to these claims.

### C. Failure to Train

Mr. Johnson has not presented evidence supporting a failure to train, supervise, or instruct claim against either the City of Olympia or Officer Henrichsen. See, e.g., Young v. City of Visalia, 687 F. Supp. 2d 1141, 1149-50 (2009). The Court GRANTS Defendants' Motion as to this claim.

### D. Municipal Civil Rights

Mr. Johnson has not presented evidence supporting a municipal civil rights claim. A municipality "can be liable for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999). To show ratification, a plaintiff must show that the "authorized policymakers approve a subordinate's decision and the basis for it." Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004). The Court GRANTS Defendants' Motion as to this claim.

### E. Negligence

Mr. Johnson has not presented evidence that a duty was owed to him under the public duty doctrine, as required to support a claim for negligence against a governmental entity. Pepper v. JJ Welcome Construction, 73 Wn. App. 523, 531 (1994). The Court GRANTS Defendants' Motion as to this claim.

**Conclusion**

The Court finds that Mr. Johnson has not set forth evidence in support of his claims for intentional infliction of emotional distress (outrage); violation of 42 U.S.C. §§ 1981 and 1985(3); misconduct of public officers; violation of the Eighth and Fourteenth Amendments; failure to train, supervise, or instruct; violation of municipal civil rights; or negligence, and therefore GRANTS Defendants' Motion with respect to these claims.

The Court finds that Mr. Johnson has not set forth evidence in support of his Fourth Amendment claim against Officer Wilson, and GRANTS Defendants' Motion with respect to this claim. However, the Court finds that disputes of material fact preclude summary judgment with respect to the remaining officers, and similarly preclude a determination that those officers are entitled to qualified immunity.

Mr. Johnson's Fourth Amendment claims against Officers Donald, Clark, Hazen, and Henrichsen and Sergeant Renschler shall proceed to trial.

The clerk is ordered to provide copies of this order to all counsel.

Dated September 28, 2018.

Marsha J. Pechman
United States District Judge